Joseph Tuohy was convicted of receiving stolen property in the first degree and of illegal possession of a credit card, violations of §§ 13A-8-17 and 13A-9-14(a), Ala. Code 1975, respectively. Tuohy was sentenced to 10 years' imprisonment on each conviction, the sentences to be served concurrently. The trial court imposed a fine of $5,000, ordered Tuohy to pay $100 to the victims compensation fund, and ordered him to pay court costs.
 I.
Tuohy argues that the trial court erred in denying his motion to suppress evidence of a stolen credit card discovered during aTerry patdown. At the hearing on a motion to suppress, Tuohy argued that the officer exceeded the scope of Terry v. Ohio,392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), by seizing a stolen credit card during a protective patdown search. The trial court denied Tuohy's motion.
The following evidence was elicited at the hearing on the motion to suppress and at trial. In the early morning hours of November 5, 1997, Officer Pat Bertagnolli, Jr., employed by the Daphne Police Department, responded to a burglary call in the Spanish Fort area. The Baldwin County Sheriff's Department had requested backup. Officer Bertagnolli arrived at the victim's residence and was given a description of the suspects, who were later identified as Joseph Tuohy and William Pond. While Officer Bertagnolli was driving around looking for the suspects, he noticed a pickup truck parked on a dirt road, not far from the victim's residence. (Supp.R. 22-23.) Officer Bertagnolli approached the truck, asked the two men to get out of the truck, advised them that a burglary had occurred at a nearby residence, and asked them to identify themselves. Tuohy identified himself as Timothy Beaudreaux. While the officer was conducting a patdown search of Tuohy, Tuohy told Officer Bertagnolli that he did not have any identification with him. (R. 49.) During the patdown search, Officer Bertagnolli felt what he thought was an identification card in Tuohy's front pants pocket. (Supp.R. 29.) The officer seized what he thought was an identification card, discovering instead an ATT Universal MasterCard credit card belonging to the victim of the burglary. The officer detained the two men for further investigation by the Spanish Fort Police Department; he handcuffed them and placed them in his patrol vehicle. (Supp.R. 23-24.) The officer testified that he "didn't place them under arrest. [He] just advised them what was going on and that they were being detained pending further investigation and Spanish Fort's arrival to check on the matter." (Supp.R. 28.) *Page 898 
Shortly after the officer conducted the patdown search, several officers from the Spanish Fort Police Department arrived, including Investigator David Edgar, and Officer Bertagnolli remained at the scene to assist. Officer Bertagnolli gave the credit card to Investigator Edgar. (Supp.R. 5.)
Investigator Edgar transported Tuohy and Pond to the Spanish Fort Police Department. Edgar took Tuohy into his office and read Tuohy his Miranda rights from a form, which Tuohy signed, indicating he had been read his rights. Tuohy then waived his Miranda rights by signing a waiver found on theMiranda form. Subsequently, Tuohy gave the following statement to Investigator Edgar:
 "On Tuesday 11/4/97, at about 8:00 a.m. I drove from Mobile to Spanish Fort. I was driving my car (a 1975 Plymouth Valiant). No one was with me. I decided to stop at a dirt road and snort my cocaine. I bought the cocaine in Mobile and brought it to Spanish Fort.
 "I got out of the car to urinate and found a bunch of credit cards on the ground. I picked them up and left[,] going to Mobile. I kept a few of them but some of them I threw away. I went to Springdale and Bel-Air malls and used the cards. I had my younger brother with me. I was wearing a Dallas Star's Hockey Jersey. Later I went to Gayfers. I knew security was looking for me so I kind of hid from them.
 "My friend and I came back this morning looking for more credit cards. He parked on the same road, then the police came and took us to the police department."
(Supp.C. 11.)
Investigator Edgar obtained a search warrant for Tuohy's residence. The grounds for obtaining the search warrant were "[t]hat Mr. Tuohy had in his possession a stolen credit card . . . that he lied . . . about his home address, and that there were several other items that were taken during this burglary. . . ." (Supp.R. 12.) Officers with the Mobile Police Department and Investigator Edgar went to Tuohy's residence and found several guns, rifles, and shotguns, as well as a safe, a video camera, two 35 mm. cameras, and wills and documents, all belonging to the victim of the burglary. Theses items were seized and taken to the Spanish Fort Police Department. The victim identified the objects seized by the police as his own. (Supp.R. 12-13.)
"`In reviewing a trial court's ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial.'" Stone v. Cityof Huntsville, 656 So.2d 404, 406 (Ala.Crim.App. 1994), quotingHenry v. State, 468 So.2d 896, 899 (Ala.Crim.App. 1984).
In reviewing a trial judge's decision on a motion to suppress where the evidence is not in dispute, we apply a de novo standard of review. See State v. Hill, 690 So.2d 1201 (Ala. 1996); Barnesv. State, 704 So.2d 487 (Ala.Crim.App. 1997).
Tuohy argues that the trial court erred by denying his motion to suppress the evidence. Specifically, he contends that the trial court should have suppressed evidence of the credit card because, he says, the officer's search exceeded the scope permitted by Terry. Tuohy further argues that all the evidence obtained after the discovery of the credit card should be suppressed as "fruit of the poisonous tree." Because we find no caselaw directly on point, this is a matter of first impression.
In Terry, the United States Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." It is well established that
 "a police officer may make a brief investigatory detention based upon a `reasonable *Page 899 
suspicion' of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Crim.App. 1989), quoting from United States v. Post, 607 F.2d 847 (9th Cir. 1979), discussed `reasonable suspicion' as mentioned in Terry and stated:
 "`[T]he quantum of cause necessary to justify an investigatory stop is a "reasonable" or "founded" suspicion that the person has committed or is about to commit a criminal act. . . . The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience.'"
Gaskin v. State, 565 So.2d 675, 677 (Ala.Crim.App. 1990). "UnderTerry, a stop may be made on the basis of reasonable suspicion, which is a less demanding standard than probable cause; it may be satisfied by a lesser quantity or content of information or less reliable information than would be required for a finding of probable cause." Atwell v. State 594 So.2d 202 (Ala.Crim.App. 1991), cert. denied sub nom., Inabinett v. State, 594 So.2d 214
(Ala. 1992), citing Alabama v. White, 496 U.S. 325 (1990). In order to determine whether an officer's suspicion of criminal activity was reasonable, we must evaluate the totality of the circumstances as they appeared to Officer Bertagnolli at the time he stopped Tuohy. See Duckworth v. State, 612 So.2d 1284, 1286
(Ala.Crim.App. 1992).
In light of the circumstances surrounding the stop of Tuohy's truck, we believe that Officer Bertagnolli had reasonable suspicion to believe that Tuohy had been involved in criminal activity. The officer noticed a pickup truck parked on a dirt road at approximately 3:00 a.m. More importantly, the truck was parked near the scene of the burglary. These facts constitute sufficient reasonable suspicion to conduct a Terry stop. SeeHickman v. State, 548 So.2d 1077 (Ala.Crim.App. 1989) (an accused's presence near a recently reported crime may justify a Terry stop.)
We further conclude that the officer's seizure of the credit card for purposes of identification was within the scope of the investigative detention. We are aware of no constitutional proscription against asking an individual stopped pursuant toTerry to identify himself. See Hayes v. Florida, 470 U.S. 811,105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); United States v. Sharpe,470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); United Statesv. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Inquiries of the suspect's identity are typically the first questions asked by an officer. In fact, the officer's first question in Terry was to ask the suspects' names. See Terry v.Ohio, 392 U.S. at 6-7. "Without question, an officer conducting a lawful Terry stop must have the right to make this limited inquiry [as to identification], otherwise the officer's right to conduct an investigative detention would be mere fiction." People v.Loudermilk, 195 Cal.App.3d 996, 1002, 241 Cal.Rptr. 208 (1987).
The California Court of Appeal in Loudermilk, addressed the issue now before this court. We agree with the well-reasoned opinion of that court. Presiding Judge Low wrote:
 "Deputy Sheriffs Sanford Geaslin and Bob Haran responded to the broadcast, and, at 4:30 a.m., while searching north of Healdsburg on Highway 101, they spotted defendant hitchhiking. Defendant's appearance matched the broadcast description. Officer Geaslin requested defendant to produce identification; defendant responded that he didn't have any. Officer Geaslin then patsearched him for weapons, but found none. The officer did, however, feel a wallet in defendant's right rear pocket. Officer Geaslin reached in, removed the wallet, opened it up and began searching for identification.
". . . . *Page 900 
 "As part of this inquiry, the police officer may require the suspect to produce proof of identification, if he has it. The suspect has no constitutional right to keep his identity a secret under the circumstances existing here. If he refuses to identify himself to the officer, this fact may by itself be considered suspect and together with surrounding events may create probable cause to arrest. Likewise, the Terry suspect may not lie to the officer with impunity about his identity if there is a quick and minimally intrusive method of resolving the doubt. It is commonplace in our society for traffic officers to require motorists to remove their driver's license from their wallets when stopped by the officer. To require [a] defendant . . . to display his driver's license or other proof of identification is a minor intrusion which is strictly limited to the sole justification of the detention. . . .
". . . .
 "The seizure of defendant's wallet under these circumstances was reasonably related to the purpose and scope of the investigative detention. The officer was not conducting a general `fishing expedition' for whatever evidence he could find, but sought merely to learn defendant's identity."
Id. at 1000-02. The court further explained that requiring "the officer to ignore the wallet and allow defendant to continue his deception would reduce the right to conduct a lawful detention to a nullity. Our interpretation of the Fourth Amendment does not command such an absurd result." Id. at 1003.
Applying this reasoning to this present case, we find that Officer Bertagnolli was justified in asking Tuohy his name and in seeking identification during a proper patdown search after Tuohy gave Officer Bertagnolli false information. Tuohy responded that his name was Timothy Beaudreaux and told the officer that he did not have any identification on him. During a lawful patdown search, Officer Bertagnolli felt what he thought was an identification card. The officer was justified in seizing what he believed was an identification card from Tuohy for the purpose of identifying Tuohy because Tuohy initially gave the officer false information; therefore, Officer Bertagnolli's seizure of the identification card was reasonably related to the purpose and scope of the investigative detention. The officer was not fishing for evidence, but was merely seeking to learn Tuohy's identity. Discovery of the stolen credit card occurred as the result of a proper seizure of what appeared to be an identification card. Hence, the stolen credit card found by Officer Bertagnolli was properly seized.
We must emphasize that we do not hold by our decision today that an individual may be detained and searched merely because he refuses to identify himself or to produce identification. Nor do we hold that an officer may immediately search an individual for identification and seize anything resembling an identification card. Our decision today, authorizing the officer to seize an identification card from a suspect's pocket, is limited to the unique facts of this case about not having identification on his person. We conclude that the seizure of Tuohy's identification card, even though it was actually a stolen credit card, is consistent with Fourth Amendment guarantees.
 II.
Tuohy argues that the trial court should have granted his motion for a mistrial based on the testimony of Officer David Edgar. During the State's direct examination of the officer, the following discussion occurred:
 "Q. [STATE]: Go ahead. How did you go about obtaining that search warrant?
 "A [INVESTIGATOR]: I went to the District Judge, Judge McMaken in Mobile County who issued the search warrant *Page 901 
to search the Defendant's address of 58 Norther Sage Avenue.
 "Q [STATE]: Is that the address that he gave you initially, the Defendant?
 "A [INVESTIGATOR]: No, ma'am, the initial address he gave me was 3303 Rocky Springs Court. I have got it here. 3033 Rocky Springs Court in Mobile.
 "Q [STATE]: Did you later learn that his address was different?
"A [INVESTIGATOR]: Yes, ma'am, I spoke to —
 "MR. MITCHELL [DEFENSE COUNSEL]: Judge, I would object unless this is on personal knowledge.
"THE COURT: What was that again?
 "MS. BOSCH [STATE]: I asked Investigator Edgar if he obtained information that the address given to him by the Defendant was, in fact, not correct.
"THE COURT: Overrule the objection.
 "A [INVESTIGATOR]: Yes, ma'am, I spoke with his probation officer Edgar Juror (spelled phonetically).
"MR. MITCHELL: Object to hearsay.
"THE COURT: Go ahead, David.
 "A [INVESTIGATOR]: I spoke to his probation officer, Edgar Juror, in Mobile and he gave me the address of 58 North Sage Avenue in Mobile as his correct street address.
 "MR. MITCHELL: Judge, may I approach? In addition, Judge, not only hearsay, now prior he was on probation that is not only hearsay that is eliciting testimony that he was on probation for a crime from his probation in front of the jury without proper predicate.
"THE COURT: That's all we need to talk about — probation.
"MS. BOSCH [STATE]: Yes, sir, I won't ask him anything.
"THE COURT: Okay.
"MR. MITCHELL: And just for the record, [I] move for mistrial.
"THE COURT: Deny the motion."
(R. 78-80.)
Tuohy contends that the trial court committed reversible error by allowing the investigator to testify that he obtained the address for the search warrant from Tuohy's probation officer. Specifically, Tuohy argues that the reference to his probation officer constitutes improper bad character evidence.
Tuohy failed to state this ground in the above colloquy; therefore, the issue is not preserved for our review. "The trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on the particular legal issues involved." Finch v. State,715 So.2d 906, 911 (Ala. 1998), citing Bland v. State, 395 So.2d 164,168 (Ala.Crim.App. 1981). An objection based on a specific ground "waives all other grounds not specified, and the trial court will not be put in error for grounds not assigned at trial." Glass v.State, 671 So.2d 114, 120 (Ala.Crim.App. 1995). Moreover, Tuohy neither requested nor objected to the trial judge's failure to give a curative instruction. See Goodwin v. State, 728 So.2d 662
(Ala.Crim.App. 1998); Davis v. State, 740 So.2d 1115
(Ala.Crim.App. 1998).
For the above-stated reasons, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur. *Page 902