739 So.2d 539 (1998)
Joe LITTLE
v.
STATE.
CR-96-1071.
Court of Criminal Appeals of Alabama.
December 18, 1998.
Rehearing Denied March 26, 1999.
Domingo Soto, Mobile, for appellant.
Bill Pryor, atty. gen., and Thomas F. Parker IV, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Joe Little, was convicted of two counts of murder, a violation of § 13A-6-2, Ala.Code 1975, and one count of robbery, a violation of § 13A-8-41, Ala. *540 Code 1975. He was sentenced to life imprisonment on each count; the sentences were to run concurrently.
Evidence presented at trial tended to show the following. On January 6, 1996, George Tawan Dean and Frederick Glover were drinking and listening to music. The two men talked about "making a lick," which, according to Dean's testimony, could mean committing a robbery, selling drugs, or "getting some money any way you can." At around 7:00 p.m. that evening, Dean and Glover met Little. The three men talked for a while and then walked to a nearby convenience store to purchase cigarettes and wine. At around 10:00 p.m., as the trio walked along Michigan Avenue, a man in a red pickup truck pulled alongside them and indicated that he was interested in buying drugs. One of the three directed the man to turn onto nearby Colgin Street and to wait for them. The three then walked to where the truck had stopped. Little opened the passenger door and got inside the truck, while Glover walked to the driver's side and stood outside the truck looking in at the driver and Little. Dean stood behind Glover, farther away from the truck. Dean testified that he heard some words being exchanged before a shot was fired. He did not see who fired the shot; all he saw was a "flash" inside the truck. Stephen Wyatt, the driver of the truck, was shot in the head. The bullet passed through Wyatt's head and exited through his neck and then struck Glover in the neck. The truck began to move down the street. As the truck moved down the street, Dean heard one or two more gunshots. The truck sideswiped a parked car and crashed into a tree stump. Little got out of the truck and stumbled into a nearby yard. He then went to see Elenora Hall, a friend of his who lived nearby. Hall took Little to a hospital emergency room. Dean left Glover lying in the street and ran to Limerick Street to get help. Meanwhile, several residents of nearby houses had called the police.
Melvin Parker, who lived at 1504 Colgin Street, testified that he was watching television on the evening of January 6 when he heard a loud noise outside. He went to his door and saw a black man staggering in his yard. He noticed that the man was wearing a black jacket with some writing on it. Parker went back inside and placed a "911" telephone call to the Mobile Police Department. When he returned to the door, the black man was gone.
Christi Hendrix, who lived at 1503 Colgin Street, testified that after she heard several gunshots on the evening of January 6, she looked outside to see what was happening. She saw a black man lying in the street, and told her sister to call the police. Hendrix went outside to where the man was lying and saw a gun next to him. In her opinion, the man was dead. She then walked over to where a red pickup truck had crashed into a tree stump. There was a white man in the driver's seat; he appeared to her to be near death. While Hendrix was outside, she saw several people drive up in a car, put the black man into the car, and drive away before the police arrived.
Mobile police officers investigating the incident discovered a Rossi .38 caliber revolver in Melvin Parker's yard. There were two full cartridges in the gun, two empty casings, and one empty chamber. Less than 100 feet from where the police found the revolver, they found a leaf with blood on it. The police discovered a Colt.38 caliber special in the street, next to a puddle of blood. The Colt was fully loaded, with six cartridges. The weapons were processed for latent fingerprints, but the results were inconclusive. Inside Wyatt's truck, the police noted damage to the dashboard on the passenger side of the truck and to the glove compartment, as well as bloodstains on the windshield above the damaged portion of the dashboard. They also found a bloody $20 bill and a marijuana cigarette butt on the driver's side of the truck.
*541 Stephen Wyatt died as a result of two gunshot wounds to the head. One of the bullets that struck Wyatt passed through his neck and killed Frederick Glover when it struck Glover in the neck. Forensic testing established that the fatal shots were fired from a Rossi .38 caliber handgun. However, authorities were unable to positively determine whether the fatal shots were fired from the same Rossi .38 caliber revolver found in Melvin Parker's yard, because the bullets recovered from Wyatt's and Glover's bodies were damaged on impact.
Blood samples were collected from Little, Wyatt, and Glover, in an attempt to identify the various bloodstains found in Wyatt's truck, on Little's clothes, on the handguns, and on a leaf found near the Rossi revolver. DNA testing established that blood found on Little's jacket belonged to Wyatt. DNA testing also established that the blood on the leaf was Little's. However, DNA testing of bloodstains on the windshield of Wyatt's truck, as well as bloodstains on the guns, was inconclusive.
Mobile police officers took Little into custody at the hospital emergency room. They transported Little from the hospital emergency room to the Mobile police station, where he was questioned by Investigator Donald Pears. In his statement to Investigator Pears, which was admitted at trial, Little denied any involvement in the shooting. Little told Investigator Pears that he did not know anything about the shooting and that he had been "nowhere around any of this." Little stated that he was walking with Glover and Dean on the night of January 6, but that he stopped for a moment and that the other two walked on ahead. He stated that while he was standing alone, someone struck him from behind, causing him to lose consciousness. Little told Investigator Pears that when he regained consciousness, he made his way to Elenora Hall's house, and Hall took him to the hospital emergency room for treatment.
Little testified in his own behalf at trial. Contrary to his statement to Investigator Pears, Little admitted that he was, in fact, present during the shooting; however, he maintained that the shooting was an accident. Little also denied that he and his companions intended to rob Wyatt. Instead, he characterized the shooting as a "drug deal gone bad." Little testified that he got into Wyatt's truck to sell him a "dime bag" of marijuana and that Wyatt pulled a gun on him. According to Little, he and Wyatt then struggled over the gun, and the gun went off, shooting them both.
Police did not find a "dime bag" of marijuana inside Wyatt's truck, or on Little's person in the emergency room.
Little, who was 16 years old at the time of the offense, contends that the trial court erred by denying his motion to suppress his custodial statement to Investigator Pears. Specifically, he asserts that he was not informed before making the statement that he had a right to communicate with his parent or a guardian, as provided for in Rule 11(B)(4), Ala.R.Juv.P.
Rule 11(B), Ala.R.Juv.P., commonly referred to as the "juvenile Miranda[1]" or "SuperMiranda" rights, enumerates the rights of a child who is in custody but who has not yet been questioned. It provides as follows:
"Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
"(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;

*542 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
"(4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
The state acknowledges that Little was not advised of his "juvenile Miranda" rights as set out in Rule 11(B), but it argues that the trial court correctly determined that Little was not entitled to the protections afforded by Rule 11(B) because he was being investigated for a Class A felony and, under § 12-15-34.1, Ala.Code 1975, he was not subject to the jurisdiction of the juvenile court but was to be charged, arrested, and tried as an adult.[2]
This issue has been resolved in our recent decisions in Anderson v. State, 729 So.2d 900 (Ala.Cr.App.1998), and Young v. State, 730 So.2d 1251 (Ala.Cr.App.1998). In Anderson, this court held:
"We find nothing in the language of § 12-15-34.1 to support the state's contention that the rights granted a child pursuant to Rule 11(B) are extinguished by the fact that a child alleged to have committed an offense enumerated in that statute `shall be charged, arrested, and tried as an adult' and automatically subjected to the jurisdiction of the adult system. While § 12-15-34.1 clearly modifies the jurisdiction of the juvenile court and divests a child accused of committing a serious offense of the right to a transfer hearing in the juvenile court, it does not modify the statutory definition of the term `child' and does not, by its terms, divest the child of the protections afforded by Rule 11(B). If the legislature, when enacting § 12-15-34.1, had intended to exclude from the statutory definition of `child' juveniles 16 years of age or older at the time of committing an offense enumerated in the statute, we may presume that it would have done so. It did not.
"The terms `charged, arrested, and tried' as used in § 12-15-34.1 cannot feasibly be viewed as synonyms for `questioned.'"
729 So.2d at 903-04 (citations omitted). "If the Legislature had wanted children to be `interrogated' as adults, it could have included the word `interrogated' immediately before the words `charged, arrested, and tried as an adult' [in § 12-15-34.1]." Young, 730 So.2d at 1254. We adopt our rationale in Anderson and Young in holding that Little's custodial statement was wrongfully admitted in evidence because Little was not informed that he had a right to communicate with his parent or guardian as provided in Rule 11(B)(4), Ala. R.Juv.P.
However, a finding of error does not necessarily require that Little's convictions be reversed. Just as we did in Anderson and Young, we must determine whether the receipt into evidence of Little's statement constituted harmless error. Coral v. State, 628 So.2d 954, 973 (Ala.Cr. App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). "`In order for a constitutional error to be deemed harmless under Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], the state must prove beyond a reasonable *543 doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, [Ala. R.App.P.,] the state must establish that the error did not injuriously affect the appellant's substantial rights.' Coral, 628 So.2d at 973." Anderson, 729 So.2d at 904.
During its case-in-chief, the state offered Little's statement in which he denied any involvement in the shooting. The prosecution then offered DNA evidence conclusively connecting Little to the scene of the shooting and, thus, discrediting Little's statement. In an attempt to explain the inconsistencies between his statement to Investigator Pears and his trial testimony, Little testified that the reason he denied any involvement in the shooting was that he did not want to tell Investigator Pears that he was involved in a drug transaction at the time of the shooting. Little also explained that he did not recall what had happened on the night in question until sometime after his interview with Investigator Pears. Furthermore, he testified that what really happened that night came to him "in a dream."
Although Little's custodial statement, standing alone, was not incriminating, it was highly inconsistent with his testimony at trial. By offering during its case-in-chief DNA evidence establishing Little's presence at the shooting, and also offering Little's statement denying all involvement with the shooting, the state left Little with no choice but to take the stand and to attempt to explain his previous statement. The state, during its cross-examination of Little, used his prior statement to cast doubt on the credibility of his trial testimony. Little's explanations regarding these inconsistencies added little to his credibility. Particularly troubling was Little's explanation that the version of events he testified to at trial came to him in a dream sometime after his interview with Investigator Pears. In addition, during its closing argument, the state effectively used the conflicts between Little's statement and his trial testimony, arguing that Little had changed his story for trialafter DNA evidence conclusively discredited his earlier version of events. Although we cannot say that the jury accepted the state's interpretation of Little's statement in this regard, we also cannot say with any certainty that the jury could not have found the state's argument to be persuasive.
Accordingly, we are unable to say that the error in admitting Little's custodial statement into evidence at his trial was harmless beyond a reasonable doubt. Therefore, the judgment in this case is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB and BASCHAB, JJ., concur
BROWN, J., dissents with opinion.
McMILLAN, J., joins dissent.
BROWN, Judge, dissenting.
I must respectfully dissent from the majority opinion reversing the appellant's felony-murder conviction based on the police officer's failure to advise Little of his rights under Rule 11(B), Ala.R.Juv.P., the "juvenile Miranda" rights.
The majority's decision is based on Anderson v. State, 729 So.2d 900 (Ala.Cr. App.1998), and Young v. State, 730 So.2d 1251 (Ala.Cr.App.1998), and it quotes the following language from Anderson:
"We find nothing in the language of § 12-15-34.1, Ala.Code 1975, to support the state's contention that the rights granted a child pursuant to Rule 11(B) are extinguished by the fact that a child alleged to have committed an offense enumerated in that statute `shall be charged, arrested, and tried as an adult' and automatically subjected the jurisdiction of the adult system. While § 12-15-34.1 clearly modifies the jurisdiction of the juvenile court and divests a child accused of committing a serious offense *544 of the right to a transfer hearing in the juvenile court, see Price v. State, 683 So.2d 44 (Ala.Cr.App.1996), it does not modify the statutory definition of the term `child' and does not, by its terms, divest the child of the protections afforded by Rule 11(B). If the legislature, when enacting § 12-15-34.1, had intended to exclude from the statutory definition of `child' juveniles 16 years of age or older at the time of committing an offense enumerated in the statute, we may presume that it would have done so. It did not."
729 So.2d at 903-04.
Upon further examination of § 12-15-34.1, Code of Alabama 1975, I believe that the legislature intended to withdraw from those persons falling within the purview of the statute all protections traditionally afforded a "child." "It is a `well established principle of statutory interpretation that the law favors rational and sensible construction.' "King v. State, 674 So.2d 1381, 1383 (Ala.Cr.App.1995) (quoting 2A Norman J. Singer, Sutherland Statutory Construction § 45.12 (5th ed.1992)). Moreover, "`[t]he courts will not ascribe to the legislature an intent to create an absurd or harsh consequence, and so an interpretation avoiding absurdity is always to be preferred.'" Daugherty v. Town of Silverhill, 672 So.2d 813, 816 (Ala.Cr.App. 1995) (quoting 1A C. Sands, Sutherland Statutory Construction § 23.06 (4th ed.1972) (emphasis omitted)).
Section 12-15-34.1 provides, in pertinent part:
"(a) Notwithstanding any other provision of law, any person who has attained the age of 16 years at the time of the conduct charged and who is charged with the commission of any act or conduct, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:

"(1) A capital offense.
"(2) A Class A felony.
"(3) A felony which has as an element thereof the use of a deadly weapon.
"(4) A felony which has as an element thereof the causing of death or serious physical injury.
". . . ."
(Emphasis supplied.)
The language of the statute could not be clearer: anyone over the age of 16 who commits any of the listed offenses is to be treated as an adult; that person shall be removed from the jurisdiction of the juvenile court. The language of the statute plainly excludes juveniles 16 and older from the definition of a "child" by stating that they are to be treated as adults. In my opinion, this Court's holding that the fact that the statute provides that the juvenile is to be treated as an adult does not mean that he was divested of the protections afforded by Rule 11(B), Ala.R.Juv.P., amounts to sophistry. That holding creates a new category of criminal defendant, one who is neither wholly a "child" nor entirely an "adult." Certainly, this could not have been what the legislature intended when it enacted § 12-15-34.1.
I believe this Court's reliance on the Alabama Supreme Court's decisions in Ex parte Jackson, 564 So.2d 891 (Ala.1990), and Ex parte Whisenant, 466 So.2d 1006 (Ala.1985), is misplaced. As the state correctly points out, both of those cases were decided before the enactment of § 12-15-34.1. At that time, the only method by which juvenile defendants could be tried as adults in circuit court was by way of a transfer hearing in the juvenile court, as provided in § 12-15-34. Because every juvenile defendant's case originated in juvenile court, Rule 11(B) was therefore applicable to the initial encounters between the juveniles and the law enforcement officers in Jackson and Whisenant.
By contrast, § 12-15-34.1 prevents an entire category of juvenile defendants from ever encountering the juvenile court system. Because none of the proceedings *545 against the appellant in these cases took place in juvenile court, the Alabama Rules of Juvenile Procedure have no application. See Rule 1, Ala.R.Juv.P. ("These rules govern the procedure for all matters in the juvenile court.") This Court's original interpretation of § 12-15-34.1 was neither rational nor sensible.
There may be strong policy arguments in favor of requiring that juveniles removed from the jurisdiction of the juvenile court pursuant to § 12-15-34.1 be advised of the rights enumerated in Rule 11(B), Ala.R.Juv.P. See Anderson, 729 So.2d at 902. However, it is not the province of this Court to make policy. Our function is to interpret the law. Art. III, § 43, Alabama Constitution of 1901, states:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
"Courts, above all others, are charged with a very sacred duty not to encroach upon the domain of other departments of government under our constitutional system of government." Hendrix v. Creel, 292 Ala. 541, 545, 297 So.2d 364 (1974). As the Alabama Supreme Court stated in Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 911 (Ala.1992):
"`No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary. Accordingly, we have held that courts cannot and will not interfere with the discretion vested in other units or branches of government.'"
Quoting Finch v. State, 271 Ala. 499, 503, 124 So.2d 825 (1960).
Although the majority opinion purports merely to interpret § 12-15-34.1, it actually legislates, by choosing to overlook the express language of the statute. Courts lack the legislative authority to make policy decisions; that authority has been constitutionally assigned to the executive branch and the legislative branch. I believe that the opinion sets a dangerous precedent by disregarding the clear language of § 12-15-34.1, and replacing it with a somewhat tortured interpretation.
Accordingly, I would affirm the appellant's conviction for felony murder. In addition, although the majority's decision never reaches the issue of the sufficiency of the evidence on which the appellant was convicted of first-degree robbery, I would also affirm the appellant's conviction for first-degree robbery.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Section 12-15-34.1, Ala.Code 1975, provides, in pertinent part:

"(a) Notwithstanding any other provision of law, any person who has attained the age of 16 years at the time of the conduct charged, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:
"(1) A capital offense.
"(2) A Class A felony.
"(3) A felony which has an element thereof the use of a deadly weapon.
"(4) A felony which has an element thereof the causing of death or serious physical injury."